IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| NAOMI BENNETT, an individual; and JANET HUGHES, an individual, on behalf of themselves and others similarly situated,<br><br>            Respondents,<br><br>v.<br><br>PROVIDENCE HEALTH & SERVICES, a Washington Nonprofit Corporation,<br><br>            Appellant. | No. 86321-5-I<br><br>DIVISION ONE<br><br>UNPUBLISHED OPINION |

COBURN, J. — Former hourly employees Naomi Bennett and Janet Hughes successfully brought a class action against healthcare provider Providence Health & Services (Providence) on behalf of two classes totaling more than 33,000 employees (caregivers[1]) for deprivations of wages for hours worked and missed meal breaks as required under the Washington Minimum Wage Act (MWA), chapter 49.46 RCW, and the Industrial Welfare Act, chapter 49.12 RCW. Following a jury trial on damages, the trial court awarded plaintiffs double damages that resulted in a nearly $230 million judgment. Providence appeals the trial court's granting of summary judgment finding liability, awarding of double damages, and instructing the jury that employees may be

---

[1] Providence refers to its hourly employees as "caregivers." Because both parties use this term in their briefing, we do as well. Caregivers included employees who worked at various Providence workplace locations in Washington.

awarded overtime wages for missed meal breaks. We affirm.

FACTS AND PROCEDURAL HISTORY

In September 2021 Bennett filed a class action against Providence seeking relief for unpaid hours of work and missed second meal periods. Bennett worked for Providence as an hourly-paid certified nursing assistant. Bennett alleged that Providence systematically, through uniform policies and practices, willfully and intentionally failed to properly compensate caregivers for all hours worked as a result of its time-clock-rounding policy and failed to provide meal breaks. Bennett alleged that these policies and practices violated Washington law, including the MWA[2] and the Wage Rebate Act (WRA), chapter 49.52 RCW.

Providence generally compensates its hourly employees according to data from its timekeeping system called Kronos. Kronos records and stores the times of day that hourly employees "'clock' in or manually log their time 'in' and 'out' for their scheduled shifts." Providence expects its hourly employees to accurately track their time worked in Kronos, including when they start and end their shifts.

During the relevant period, Providence had a policy of rounding hourly employees' reported work time to the nearest 15-minute increment for pay purposes. For example, when an employee clocked in within seven minutes before or after the scheduled start of their shift, Kronos would round the start of their work time to the scheduled shift start time.

Providence also programmed Kronos to automatically deduct 30 minutes for one unpaid meal period for caregivers who worked at least five hours based on the

_____

[2] See RCW 49.46.910.

assumption that eligible employees took their first meal breaks. If an employee did not take their first meal break, they were expected to record it in Kronos by cancelling the auto-deduction. Providence, however, did not assume that eligible employees took a second meal break and thus did not automatically deduct time for second meal periods.

Providence employees regularly work 12-hour shifts. Based on its presumption that eligible employees took their first meal breaks, it was Providence's practice to generally have employees' 12-hour shifts last 12-and-a-half hours from start to finish. Providence expected eligible employees who wanted to take their second meal break to work an additional 30 minutes after their scheduled shift end time for a total of 13 hours.

In February 2023 Bennett amended the class action complaint, adding former Providence hourly employee[3] Janet Hughes as a plaintiff and putative class representative. Plaintiffs subsequently moved for class certification for an hourly-wage rounding class and a second meal period class. Regarding its second meal period claim, plaintiffs cited WAC 296-126-092 and asserted that Providence failed to provide a "30-minute, uninterrupted, duty-free meal period for every five hours of work" as required under Washington law.

In May the trial court certified both classes, and appointed Bennett and Hughes as class representatives. On the rounding claim, the court found that plaintiffs' expert Dr. Brian Kriegler provided testimony to support certification, including his calculations showing that the result of Providence's rounding policy disfavored about 70 percent of putative class members in terms of work hours and that 71 percent of the putative class members suffered a loss in wages.

---

[3] Hughes had previously worked for Providence as an ultrasound technologist.

The court found that it was undisputed that every Providence hourly non-exempt employee in Washington, with some exceptions, was subject to the same 15-minute increment rounding policy and declined Providence's request to narrow the class to account for varied compensation outcomes resulting from the rounding policy based on different work locations, job codes, or individual differences. The court certified the rounding class as consisting of:

> [a]ll hourly, non-exempt Providence employees who worked in the State of Washington (excluding Hospice and Homecare employees) and whose Kronos timeclock entries were rounded in 15-minute increments at any time within the period beginning three years prior to the filing of this Complaint to the date of certification of the class.[4]

As to the second meal break claim, the court stated that Dr. Kriegler's testimony supported the conclusion that 91 percent of employees eligible for a second meal period were not taking it. The court found that plaintiffs' second meal break claim was based on the issue of whether Providence ensured that hourly and non-exempt employees who worked more than 10 hours in a shift could take their second meal break or receive compensation for a missed break. Accordingly, the court rejected Providence's assertions that individualized assessments were necessary to determine whether individual employees waived their meal breaks. Instead of systematically assuming that eligible caregivers took a second meal break as Providence did with first meal breaks, the court found that Providence's policy provided supervisors with authority on how to handle caregivers' second meal period requests. The court concluded that the possibility that individual caregivers may have waived their entitlement to a second meal

---

[4] The class definition excluded caregivers who were not subject to Providence's rounding policy during the period at issue. The court found that Providence generally discontinued the rounding practice in November 2020.

break does not account for the common issue of whether, as a matter of policy, "Providence met its obligation to <u>ensure</u> all meal breaks are timely taken and <u>ensure</u> that employees record and are paid for all non-compliant meal breaks." The court certified the "Second Meal Period Class" as being comprised of:

> All hourly, non-exempt Providence employees who worked more than 10 hours in a shift in the State of Washington (excluding Hospice and Homecare employees) at any time within the period beginning three years prior to the filing of this Complaint to the date of certification of the class.

The court left open the possibility that the second meal period class may be revisited in terms of subclasses or decertification "if further discovery reveals that knowledge or lack of knowledge of the second meal policies differs widely within the class, and this has a specific impact on theories of liability and defenses."

Providence moved for reconsideration. The court denied in part and granted in part by modifying the definition of the second meal period class as follows:

> All hourly, non-exempt Providence employees who worked <u>and were clocked in</u> for more than 10 hours in a <u>single</u> shift in the State of Washington (excluding Hospice and Homecare employees) at any time within the period beginning three years prior to the filing of this Complaint to the date of certification of the class.

Also in June, plaintiffs moved to compel Providence's production of documents and testimony related to its rounding and meal period policies and practices that Providence had claimed as privileged. Plaintiffs explained in the motion that in response to discovery requests about "Providence's affirmative defense that it had a 'good faith belief' that the challenged practices were legal," Providence claimed attorney-client privilege and work-product privileges,

> such as … [Providence] respond[s] that they … acted in good faith, in the exercise of their reasonable business judgment, for good cause, with the information known to them at the time, and in accordance to their good

5

faith belief that their meal period and timeclock rounding practices were in compliance with federal, state, and local laws.

Yet, according to plaintiffs, Providence produced no evidence as to what information it knew at the time "or upon what its 'good faith belief' was based." Plaintiffs argued,

> So long as Providence maintains affirmative defenses to Plaintiffs' claims based on its "good faith belief" that its policies were lawful, and continues to assert that its wage violations were not willful, it cannot simultaneously shield documents and communications with its counsel about those policies.

In its opposition to plaintiffs' motion to compel, Providence withdrew affirmative defenses of good faith. The trial court subsequently granted in part plaintiffs' motion to compel, stating that, based on Providence's voluntary withdrawal, Providence was "precluded from asserting any defense based on its subjective understanding of law or based on a subjective belief that wages were not owed."

At a status conference in August, the parties agreed that upcoming cross-motions for summary judgment would be primarily based on legal issues.[5] Providence's counsel also informed the court at the hearing that it discovered a meal break waiver for co-class representative Hughes and had provided the documents to plaintiffs' counsel the previous day.

The following month, prior to the close of discovery, both parties moved for summary judgment and filed respective oppositions. Plaintiffs reserved the issue of damages for a later motion or trial. The trial court held a hearing on the parties' cross-motions for summary judgment. Prior to the trial court's subsequent summary judgment

---

[5] The parties had noted a summary judgment hearing for October but had not yet filed their motions.

order, Providence provided plaintiffs[6] with what it asserted were written waivers of second meal breaks for 387 individuals. Providence seems to suggest in its opening brief that it submitted evidence of 387 written waivers to the trial court at summary judgment but only cites to three written waivers.[7]

In December Providence moved to decertify the rounding and second meal period classes, which the trial court denied. In January 2024, except for Hughes' individual second meal period claim, the trial court granted summary judgment to the plaintiffs on both the rounding and second meal period claims.[8] On the rounding claim, the court concluded that Providence did not fully compensate the class for time worked in violation of the MWA and the WRA. The court also decided that Providence did not promote second meal breaks in violation of WAC 296-126-092.

As to the issue of whether Providence's violations against the rounding and second meal period classes were willful, the court cited to its prior order partially granting plaintiffs' motion to compel, noting that Providence

> withdrew its defenses to willfulness based on good faith and reasonable belief of compliance with applicable wage and hour requirements, good-faith dispute regarding the alleged violations, lack of intent and carelessness or clerical errors, and good faith reliance on law. See Order Granting Plaintiffs' Motion to Compel Discovery and Awarding Fees (Docket #84).

---

[6] The parties agreed that Providence would produce any alleged meal waivers by November 30, 2023.

[7] The record supports that as part of its opposition to plaintiffs' motion for summary judgment on issues of liability, Providence submitted to the trial court copies of purported written meal-break waivers for six employees, including Hughes, as apparent individualized examples of employees' waivers of second meal periods.

[8] The trial court determined that the submitted evidence presented a genuine issue of fact remained as to "whether Hughes was denied a second meal period, whether Hughes waived a second meal period, and whether Hughes received on-duty second meal periods."

The court found that Providence's wage violations were willful and determined that the only remaining issue for trial was the amount of damages for both claims.

Specific to the second meal break claim, the court found that Providence "has only 387 ostensible waivers," and "[t]hus … could potentially evidence waivers from 0.014 percent of the 25,914 members of the second meal period class." The court determined this was not sufficient to refute class-wide liability based on Providence's policy-based failure to ensure second meal breaks, and stated the evidence of individual waivers could instead be offered at the trial on damages.

In February 2024, prior to the trial on damages, plaintiffs moved to dismiss co-class representative Hughes' individual second meal period claim. Providence did not oppose the dismissal of Hughes' individual second meal period claim, agreeing that Hughes was "an inadequate and atypical representative of the second meal period class," but argued that the trial court had not found Bennett, alone, could serve as a representative of the class under CR 23. The court granted the motion to dismiss Hughes' individual second meal period claim without prejudice. The court "agree[d] with Plaintiffs that Ms. Hughes was not required to prevail on her individual second meal period claim for the class to remain certified or for Providence to be found liable to the class."

The parties litigated damages in a six-day jury trial in April 2024. The jury awarded $157.40 to Bennett, $487.99 to Hughes, and $9,318,271.45 to class members in compensatory damages for their rounding claims. The jury awarded $68.34 to Bennett and $90,300,325.01 to the class members in compensatory damages for their missed-second meal claim. The jury also found that Providence proved by a

8

preponderance of the evidence that some class members knowingly agreed to waive second meal periods and found that $1,324,812.04 in class member damages were subject to waivers, which the jury was told would be subtracted from the total amount of compensatory damages awarded to the class members for the second meal break claim. Based on its earlier finding of willfulness, the court doubled the jury's damage awards and awarded prejudgment interest, resulting in a judgment of $229,579,095.62.

Providence appeals.

DISCUSSION

Summary Judgment Order

*A. Standard of Review*

Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law. Strauss v. Premera Blue Cross, 194 Wn.2d 296, 300, 449 P.3d 640 (2019); CR 56(c). We review a trial court's summary judgment order de novo. Strauss, 194 Wn.2d at 300. In doing so, we engage in the same inquiry as the trial court and thus examine all the evidence presented to the trial court. Folsom v. Burger King, 135 Wn.2d 658, 663, 958 P.2d 301 (1998). We must accept Providence's, as the nonmoving party, evidence as true and construe all facts and reasonable inferences in its favor. Fairbanks v. J.B. McLoughlin Co., 131 Wn.2d 96, 101, 929 P.2d 433 (1997); Scrivener v. Clark College, 181 Wn.2d 439, 444, 334 P.3d 541 (2014).

The summary judgment process follows a burden-shifting scheme. Welch v. Brand Insulations, Inc., 27 Wn. App. 2d 110, 114, 531 P.3d 265 (2023). The moving party has the initial burden to present uncontroverted facts to establish there is no

genuine issue of material fact. <u>Id.</u> at 115. If this burden is satisfied, the burden shifts to the nonmoving party to present specific facts that show a genuine issue of material fact for trial remains. <u>Id.</u> "An issue of material fact is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party." <u>Keck v. Collins</u>, 184 Wn.2d 358, 370, 357 P.3d 1080 (2015). The nonmoving party cannot rely on speculation or conclusory assertions that unresolved factual issues remain. <u>Seven Gables Corp. v. MGM/UA Ent. Co.</u>, 106 Wn.2d 1, 13, 721 P.2d 1 (1986). In other words, "bare assertions" are not sufficient to defeat summary judgment. <u>SentinelC3, Inc. v. Hunt</u>, 181 Wn.2d 127, 140, 331 P.3d 40 (2014) (internal quotation marks omitted) (citing CR 56(e); <u>Bernal v. Am. Honda Motor Co</u>., 87 Wn.2d 406, 412, 553 P.2d 107 (1976)).

## B.  Rounding Claim

Providence contends that the trial court erred in its determination that Providence is liable as a matter of law for failing to compensate caregivers for all hours worked.

Enacted in 1959, the MWA is a remedial employment law that establishes a minimum wage for Washington employees. LAWS OF 1959, ch. 294. Under the MWA, employees are entitled to compensation for each individual regular hour and overtime hour worked. <u>Port of Tacoma v. Sacks</u>, 19 Wn. App. 2d 295, 302, 495 P.3d 866 (2021); <u>Androckitis v. Virginia Mason Med. Ctr.</u>, 32 Wn. App. 2d 418, 436, 556 P.3d 714 (2024); <u>see</u> RCW 49.46.020, .130. The MWA "'requires payment of at least minimum wage for all hours worked.'" <u>Androckitis</u>, 32 Wn. App. 2d at 435-36 (quoting <u>Carranza v. Dovex Fruit Co.</u>, 190 Wn.2d 612, 618-19, 416 P.3d 1205 (2018)). The MWA demonstrates our state legislature's "intent to create a right to compensation for each individual hour worked." <u>Carranza</u>, 190 Wn.2d at 619. "This right to compensation for 'hours worked'

was grounded in the legislature's intention 'to establish minimum standards of employment within the state of Washington.'" Androckitis, 32 Wn. App. 2d at 436 (quoting LAWS OF 1961, ch. 18, § 1; Carranza, 190 Wn.2d at 618 (quoting RCW 49.46.005(1)).

The Department of Labor and Industries (Department) is responsible for the enforcement of the MWA. Sampson v. Knight Transp., Inc., 193 Wn.2d 878, 893, 448 P.3d 9 (2019). As a remedial statute, the MWA and the regulations promulgated to serve its mandates must be liberally construed in favor of the worker. Sacks, 19 Wn. App. 2d at 303. Employers subject to the MWA are required to keep records of "[h]ours worked each workday and total hours worked each workweek" for each of its employees. RCW 49.46.070(1); WAC 296-128-010(6).

Both parties cite to the Department's administrative policy ES.D.1,[9] which provides guidance on recordkeeping requirements and permits rounding practices under the MWA and the IWA. Wash. Dep't of Lab. & Indus., Admin. Pol'y ES.D.1, at 1 (rev. Apr. 6, 2023). We defer to the Department's interpretation of wage regulations based on its expertise in this area of the law. See Pellino v. Brink's Inc., 164 Wn. App. 668, 688, 267 P.3d 383 (2011).

Section 11 of ES.D.1 states that "[e]mployers may use time clocks" and other methods to keep track of employees' dates and hours worked. The policy states that "[t]he employer controls the workplace and[,] to avoid potential pay issues surrounding time clock punches[,] should not allow employees to arrive and clock in early for their own convenience." Admin. Pol'y ES.D.1, § 11.1. Unless the employer uses a compliant

---

[9] Updated April 6, 2023.

rounding system, employers must be paid for the time they arrive before their scheduled shift starting time and before they begin their work as well as for the time they continue to work after their scheduled shift. Id. Under the policy, when an employer uses a time clock system, the employee must be permitted to clock in at the time they are required to report for work and must be permitted to clock out only when they are done with work tasks at the end of their shift. Id.

ES.D.1 provides that an employer may only use a rounding practice for timekeeping of employees' hours worked "with a time clock recordkeeping system or when a written record keeping system accurately reflects the actual time the employee signed in before and after the scheduled shift." Id. § 11.2. The policy permits rounding systems that use the 7-minute rule. Id. That is:

> when employees are 1 to 7 minutes late, they must be paid for the entire quarter-hour; if they are 8 to 14 minutes late, payment may begin at the nearest quarter-hour. If they clock out 7 minutes before the end of their shift, they must be paid to the end of that shift; if they clock out 8 minutes prior to the end of their shift, their payment may stop at the nearest quarter-hour.

Id. Importantly,

> [t]he rounding practice must work both ways so that sometimes it is rounded up and sometimes it is rounded down. Presumably, this arrangement averages out so that the employees are fairly compensated for all the time they actually work. For enforcement purposes, the department will accept this practice of computing working time provided that it is used in such a manner that it will not result, over a period of time, in failure to compensate the employees properly for all the time they have actually worked.

Id. (emphasis added).

Here, based on plaintiffs' expert analysis of caregivers' Kronos records, the trial court found that Providence's rounding policy resulted in an overall loss of wages in

12

violation of the MWA. See id. Providence asserts that the court improperly relied on Kronos records that included instances where caregivers clocked in before the start of their scheduled shift time and points to evidence that absent these early clock-in times, the rounding policy benefited caregivers by causing them to gain an average of 1.36 minutes per shift. In its briefing, Providence cites to its expert witness Deepak Goel's declaration submitted at summary judgment that states 75 percent of the time that plaintiffs claim "Providence 'gained' in gross as a result of its rounding practices" is based on "early clock-ins" or "pre-shift time." Providence argues that evidence showing caregivers did not and often could not work until their scheduled shift time creates a genuine issue of material fact as to whether caregivers were properly compensated for all hours worked under the rounding policy.

Because our state legislature has not defined hours worked under the MWA, we rely on the plain and unambiguous definition provided in WAC 296-126-002(8). Stevens v. Brink's Home Sec., Inc., 162 Wn.2d 42, 47, 169 P.3d 473 (2007). The regulation defines hours worked as "all hours during which the employee is authorized or required by the employer to be on duty on the employer's premises or at a prescribed work place." WAC 296-126-002(8).

Anderson v. Department of Social & Health Services considered a class action claim for compensation under the MWA for time that state employees spent commuting on an employer-provided ferry to work at the Special Commitment Center (SCC), a secure confinement facility located on McNeil Island. 115 Wn. App. 452, 453-54, 63 P.3d 134 (2003). During the ferry commute, "plaintiffs engage[d] in various personal activities, such as reading, conversing, knitting, playing cards, playing hand-held video

13

games, listening to CD (compact disc) players and radios, and napping." Id. at 454. The court concluded they thus "perform[ed] no work." Id. This court determined that because the employees were "not 'on duty' on the SCC's premises during their commute, nor [were] they at a 'prescribed work place,'" they were not entitled to compensation for hours worked under the MWA. Id. at 456-57 (quoting WAC 296-126-002(8)).

In Stevens, the Washington Supreme Court cited Anderson in consideration of the trial court's granting of summary judgment to technician-employees for their claim against employer Brink's Home Security, Inc. for its failure to compensate technician-employees for time spent driving company trucks from their homes to their first job site and back from their last job site. 162 Wn.2d at 44. The court determined that the technicians were on duty during the "drive time" under WAC 296-126-002(8) for purposes of payment under the MWA. Id. at 49-50.

The Stevens court split the analysis under WAC 296-126-002(8) into two parts. First, the court stated that "as in Anderson, we must evaluate the extent to which Brink's restricts Technicians' personal activities and controls Technicians' time to determine whether Technicians are 'on duty' for purposes of WAC 296-126-002(8)." Id. at 48. The Supreme Court held that undisputed facts showing that Brink's company policy prohibited the use of company trucks for personal business and required technician-employees to remain available to their supervisors to assist with other jobs "while en route to and from their homes" established that technician-employees were "on duty" during their drive time under WAC 296-126-002(8). Id. at 44, 48-49. Second, the court held that undisputed facts[10] established that the company trucks constituted a

_____

[10] These undisputed facts included that technicians were required to drive the trucks to reach customers' homes and carry necessary work tools and equipment

14

"prescribed workplace" under WAC 296-126-002(8). Id. at 44, 49.

The Supreme Court's interpretation and application of WAC 296-126-002(8) in Stevens is consistent with its prior holding in Weeks v. Chief of Washington State Patrol, 96 Wn.2d 893, 898, 639 P.2d 732 (1982),[11] wherein the court held that state troopers were on duty during their lunch breaks because, even though they were permitted to engage in personal activities during the lunch hour, "they must remain available by radio or telephone." (Emphasis added.) The Weeks court cited its decision in Lindell v. General Electric Co., 44 Wn.2d 386, 394, 267 P.2d 709 (1954), wherein it held that nuclear plant patrol employees' lunch hour was compensable as a working hour because the employees were "not free agents … under no restrictions," but were instead "under the domination and control of their superiors and … subject to be called out on a moment's notice." Id. at 897.[12]

In the instant case, plaintiffs presented undisputed evidence at summary judgment that, as a matter of policy, Providence treated caregivers' recorded time in Kronos as representative of their hours worked. Providence trained caregivers to use the Kronos system to clock in and out "in real time" and that any "[c]orrections must reflect actual time worked." Providence's human resources and payroll executive

---

necessary for servicing and installing home alarm systems, technicians spent a great deal of their workweek using the trucks as opposed to being stationed at the stationary office, technicians often completed work-related paperwork in the trucks, and technicians were required to maintain the trucks' cleanliness and in safe working order. Stevens, 162 Wn.2d at 49.

[11] Though WAC 296-126-002 has been amended since the Supreme Court's decision in Weeks, the relevant language of subsection (8) has remained the same.

[12] The Supreme Court observed in Weeks that though the Lindell decision was based on the federal Fair Labor Standards Act of 1938, as amended 29 U.S.C. §§ 201-19, the decision also represents the intent of Washington law. 96 Wn.2d at 896-97 (citing Lindell, 44 Wn.2d at 394; WAC 296-126-002(8), -092(1)).

director Jennifer Bishop testified that the best records Providence had of the actual hours worked by employees subject to the rounding policy were employees' timecards that showed their Kronos clock-in and clock-out times. Marne Larson, director of Kronos integration for Providence,[13] testified that Providence's goal for employees' use of Kronos is to ensure the accurate recording of employees' work hours.

Moreover, consistent with the above case law, the present record shows that caregivers were subject to Providence's control upon clocking in with the Kronos system. Multiple witnesses testified that Providence expected caregivers to be available to work once they clocked in for their shift.

Keegan Fisher, division chief human resources officer for Providence, testified that, as part of its code of conduct, hourly employees are expected to be clocked in and ready to work no later than their scheduled shift start time. If an hourly employee is clocked in, they are expected to follow through with job assignments and comply with safety rules. Likewise, Nina Boshart, who worked for Providence as a unit supervisor for Providence from 2009 to July 2023 before becoming a unit manager, testified that Providence has the general expectation that hourly employees follow their supervisor's directions and that if an hourly employee is clocked in, they are not allowed to ignore a direct order from a supervisor. Providence nursing manager Cathy Johnson testified to Providence's general expectation that employees will follow their supervisor's directives when they are at work and clocked in. Johnson also testified that employees are instructed to clock in at their unit to allow employees to have "[t]he seven-minute leeway

---

[13] Larson has been responsible for the Kronos application at Providence since 2013. She also is referred to in the record as Providence's director of payroll reporting and compliance.

… to clock in, put their belongings away, and have that time period to be prepared for

shift huddle." Heidi Hansen, clinical technology services director and former clinical

manager at Providence,[14] testified that Providence has work rules and expectations that

employees are expected to comply with when they are clocked in. Additionally, class

members testified that they were on duty or "on shift" once they clocked in.

In support of its argument that "Providence's policies prohibited caregivers" from

working "before their scheduled start time," Providence cites to a "Caregiver Time and

Attendance Records" policy for one of Providence's locations, St. Peter Hospital. The

policy[15] states:

> In instances when a caregiver needs to arrive early or leave late for
> personal convenience, no work should be performed before or after the
> scheduled shift. Likewise, caregivers should be in their work area and
> ready to start work at the scheduled start time.

(Emphasis added.)

We observe that the policy could reasonably be understood as discouraging

employees who work at the hospital to work prior to their scheduled shift times, but the

site-specific policy also does not prohibit it. Indeed, the policy states that "[a] caregiver

must be compensated for any time actually worked prior to or after the shift" and that

caregivers' time records must be edited to "resolv[e] discrepancies between clocked-in

records and actual time worked."

Providence otherwise cites to testimony from Hughes' and Bennett's supervisors.

Hughes' supervisor Sandra Klug testified she did not expect Hughes to work until the

scheduled start of her shift and there was no patient work assigned to Hughes prior to

---

[14] Hansen testified she has worked for Providence continuously since December 2016.

[15] The policy was last updated in August 2017.

her scheduled start time. Boshart, who supervised Bennett during her employment as a certified nursing assistant (CNA) for Providence, testified that "[f]or CNAs, work begins promptly at the scheduled start of the shift with a shift change huddle." Boshart said:

> CNAs, like many caregivers, are permitted to clock in up to seven-minutes prior to the start of their shift. This is made available as a convenience to the caregiver, and they use this time to grab coffee or a snack, store their personal items, or just talk with colleagues.
> …
> CNAs cannot perform any work prior to huddle. This more than a policy or practice prohibiting work. The incoming CNA does not have a workstation and is not assigned patients or tasks until they are transitioned them by the outgoing CNA—there is literally no work for them to do. The outgoing CNA remains responsible to their supervising RNs and for their patients until they transfer those responsibilities, individually, after the huddle.

Though Klug's and Boshart's testimony demonstrates that individual supervisor expectations or practices may have varied as to whether employees worked prior to scheduled shift times, it does not rebut the fact that Providence caregivers were subject to supervisors' direction upon clocking in. The supervisors' collective testimony also does not refute evidence that Providence considered caregivers' clock-in and -out times to constitute their work hours. An employee's <u>permitted</u> ability to perform a personal task during a workday does not mean they are not subject to an employer's control. <u>See</u> <u>Weeks</u>, 96 Wn.2d at 898; <u>see also</u> <u>Weeks</u>, 96 Wn.2d at 897 (citing <u>Armour & Co. v. Wantock</u>, 323 U.S. 126, 126-27, 132-34, 65 S. Ct. 165, 89 L. Ed. 118 (1944)) (holding that the time spent by fire guards on employer's premises was "working time" even if they did nothing).[16] Providence does not cite to evidence to counter plaintiffs' evidence that caregivers' clock-in and -out times in Kronos reflected their actual hours worked.

___

[16] The U.S. Supreme Court observed that "[r]efraining from other activity often is a factor of instant readiness to serve, and idleness plays a part in all employments in a stand-by capacity." <u>Armour</u>, 323 U.S. at 133.

Lastly, we reject Providence's argument that the trial court erred by concluding that the application of its rounding policy was unlawful. Providence argues that because its policy rounded both upward and downward in compliance with the Department's administrative policy ES.D.1, the factual question of whether the policy's effect resulted in the failure to compensate caregivers for hours worked should be left to the jury. Providence asks this court to consider its expert Goel's conclusion that Providence's rounding policy benefited caregivers or had no effect on 59.9 percent of the shifts when analyzed on a per-shift basis. Providence complains that the trial court's granting of summary judgment on a class-wide basis ignored Goel's testimony that its rounding policy benefited or was neutral for 345 job titles and various locations.

However, the trial court considered and rejected such site and position-based differences when it certified the rounding class. Providence states in its reply brief that it "is not challenging the initial class certification or specific evidentiary rulings." Nor does Providence provide any substantive argument under CR 23 to challenge the trial court's denial of its motion to decertify the class. We view the evidence as it pertains to the class as defined at the time of summary judgment. See House v. Hess Furniture, Inc., 33 Wn. App. 857, 858, 657 P.2d 813 (1983) (stating that an appellate court reviews an order on summary judgment based on "'the precise record—no more and no less,'" that the trial court had before it) (quoting Am. Universal Ins. Co. v. Ranson, 59 Wn.2d 811, 816, 370 P.2d 867 (1962)).

In sum, because Providence did not provide evidence to rebut plaintiffs' expert's testimony that the company-wide rounding policy resulted in the underpayment of wages to the rounding class, we conclude that no reasonable jury could find a genuine

issue of material fact as to Providence's liability on the rounding claim. See Admin. Pol'y ES.D.1, § 11.2. The trial court therefore did not err in determining that Providence violated caregivers' entitlement to wages for all hours worked under the MWA as a matter of law.

C. *Second Meal Period Claim*

Providence contends that because plaintiffs failed to show that caregivers did not receive either unpaid or paid meal breaks, the trial court erred by determining that Providence failed to provide caregivers who worked at least 10 hours with a second meal break as a matter of law.

The Washington Industrial Welfare Act (IWA), chapter 49.12 RCW, requires that "all employees be protected from conditions of labor which have a pernicious effect on their health." RCW 49.12.010. The director of the Department is responsible for administering and enforcing "all laws respecting the employment and relating to the health, sanitary conditions, surroundings, hours of labor, and wages of employees employed in business and industry in accordance with the [IWA]." RCW 43.22.270(4). The Department enacted regulations in chapter 296-126 WAC to protect employee health, safety, and welfare as authorized under the IWA. Pellino, 164 Wn. App. at 685.

This court has previously held that WAC 296-126-092 creates "a meaningful employee right to have the respite of a 30-minute meal period." Androckitis, 32 Wn. App. 2d at 430 (emphasis added). Under the regulation, an employee who works more than five consecutive hours is entitled to a 30-minute meal break that must occur between the second hour and the end of the fifth hour from the beginning of the

20

employee's shift. WAC 296-126-092(1)-(2);[17] see Androckitis, 32 Wn. App. 2d at 431-32 (interpreting plain language of WAC 296-126-092(1)-(2)). "[E]mployees are entitled to a 30-minute meal period … [during which they are] completely relieved from duty and receive[] 30 minutes of uninterrupted mealtime." Androckitis, 32 Wn. App. 2d at 448.

Under WAC 296-126-092(1), meal periods must be considered hours of work and thus must be paid when the employer requires employees to remain "on duty" on the premises or at a prescribed work site and act in the employer's interest. Wash. Dep't of Lab. & Indus., Admin. Pol'y ES.C.6.1, § 7 (rev. Dec. 1, 2017)[18]; Androckitis, 32 Wn. App. 2d at 432 n.7. When employees are required to remain on duty during meal periods, "the employer must make every effort to provide employees with an uninterrupted meal period." Admin. Pol'y ES.C.6.1, § 7 (emphasis added). "Even 'paid breaks must provide relief from work or exertion.'" Androckitis, 32 Wn. App. 2d at 432 n.7 (quoting Pellino, 164 Wn. App. at 692). In situations where an employee engages in work activity during a meal break, time spent on the work task does not count toward

---

[17] WAC 296-126-092 provides in respect to meal breaks:
> (1) Employees shall be allowed a meal period of at least thirty minutes which commences no less than two hours nor more than five hours from the beginning of the shift. Meal periods shall be on the employer's time when the employee is required by the employer to remain on duty on the premises or at a prescribed work site in the interest of the employer.
> (2) No employee shall be required to work more than five consecutive hours without a meal period.
> (3) Employees working three or more hours longer than a normal work day shall be allowed at least one thirty-minute meal period prior to or during the overtime period.

The remainder of the regulation addresses rest periods. See WAC 296-126-092(4)-(5).

[18] Plaintiffs and Providence cite the Department's administrative policy ES.C.6.1, which provides guidance on the interpretation and application of meal and rest period requirements under the IWA. Admin. Pol'y ES.C.6.1, at 1 (citing WAC 296-126-092). Both we and the Washington Supreme Court have previously found this policy to be persuasive in interpreting WAC 296-126-092. See Androckitis, 32 Wn. App. 2d at 447 (collecting cases).

the employee's 30 minutes of mandatory paid break time. Admin. Pol'y ES.C.6.1, § 7; Pellino, 164 Wn. App. at 692-93; Androckitis, 32 Wn. App. 2d at 446-48. Accordingly, "[i]f the meal period should be interrupted due to the employee's performing a task, upon completion of the task, the meal period will be continued until the employee has received 30 minutes total of mealtime." Admin. Pol'y ES.C.6.1, § 7. The employer must therefore pay the employee for the interrupted meal break and allow the employee to complete their 30 minutes of meal break time. Androckitis, 32 Wn. App. 2d at 446-49. As long as an employer who pays their employees during their meal breaks otherwise complies with the provisions of WAC 296-126-092, there is no meal break violation. Admin. Pol'y ES.C.6.1, § 7.

Both parties cite Brady v. Autozone Stores, Inc., wherein the Supreme Court observed that "WAC 296-126-092 imposes a mandatory obligation on the employer to provide meal breaks and to ensure those breaks comply with the requirements of WAC 296-126-092." 188 Wn.2d 576, 584, 397 P.3d 120 (2017) (emphasis added). A plaintiff may establish a prima facie claim based on a meal break violation under WAC 296-126-092 by providing evidence that their employer did not provide a timely meal break. Id. The employer may then rebut this by showing that no violation occurred or that there is a valid waiver. Id. The employer has the burden of establishing the affirmative defense of waiver. Pellino, 164 Wn. App. at 696-97. "[T]his should not be an onerous burden on the employer, who is already keeping track of the employee's time for payroll purposes." Brady, 188 Wn.2d at 584.

In the instant case, there can be no serious dispute that the record established that Providence failed to ensure that caregivers received second meal breaks in

compliance with WAC 296-126-092.

Testimony established that the Kronos records showed whether eligible caregivers took two meal periods during their shift, and that caregivers who took a second meal break were required to clock in and out in Kronos for any meal breaks that they took. Providence human resources officer Fisher was not aware of any widespread failure of employees to clock in and out for second meal breaks if they took them.

Plaintiffs' expert Dr. Kriegler opined that Providence's time and pay records revealed that 99.4 percent of employees'[19] shifts over 10 hours had fewer than two recorded meal periods. Providence's expert Robert Crandall stated that "Dr. Kriegler correctly notes that there were relatively few shifts with over 10 work hours in the data where an off-duty second meal period was recorded."

Arguing that time clock records are not sufficient to establish that an employer failed to provide mandated meal breaks to employees, Providence contends that plaintiffs' evidence of Kronos clock-in and -out records does not satisfy plaintiffs' burden to prove that caregivers did not receive timely meal breaks. We are not persuaded.

The two state appellate cases that Providence cites[20] do not stand for the proposition that time clock records categorically cannot be sufficient prima facie evidence to establish a meal-period violation claim under the IWA.[21]

Providence also refers to the Supreme Court's decision in Brady, 188 Wn.2d at

---

[19] Kriegler analyzed the number of deficient second meal periods "across all employees during the Class Period," dating back to September 30, 2018.

[20] White v. Salvation Army, 118 Wn. App. 272, 283-84, 75 P.3d 990 (2003); Iverson v. Snohomish County, 117 Wn. App. 618, 621-23, 72 P.3d 772 (2003).

[21] Providence also cites to an unreported federal district court decision that does not stand for this proposition. See Eisenhauer v. Rite Aid Headquarters, No. C04-5783 RBL, 2006 WL 1375064, at *3 (W.D. Wash. May 18, 2006) (court order).

584. But the Brady court did not decide as to what evidence is sufficient to bring a missed meal break claim under WAC 296-126-092. Rather, in consideration of certified questions from federal district court, the court held that an employer is not automatically liable if a meal break is missed because the employer may rebut an employee's prima facie claim by showing that the employee waived the meal break. Id. at 584-85. Indeed, the federal district court on remand observed that the Washington Supreme Court "did not describe what it means to 'receive' a timely meal break, or what evidence would show that an employee did not receive such a break." Brady v. AutoZone Stores, Inc., No. C13-1862 RAJ, 2018 WL 3526724, at *4 (W.D. Wash. July 23, 2018) (court order), appeal dismissed as moot, 960 F.3d 1172 (2020).[22]

Also on remand, the district court stated that time-card data showing five-hour-plus work blocks was not "a reliable indicator … that a particular employee did not 'receive' a meal break." Id. at *3. The district court observed that AutoZone proffered "a plethora of evidence" "indicating that there were many reasons why a 5+ hour time block did not adequately indicate that an employee did not receive a meal break." Id. at *4.

Providence does not point to such evidence in the instant case. However, pertinent to the instant case, the district court in AutoZone stated that "[t]he time-card data could theoretically be more persuasive if accompanied by evidence of a common … policy, formal or informal, that applied to all class members and resulted in their respective alleged violations." Id. In the present case, in addition to expert analysis of

---

[22] Providence cites to this federal district court decision in its opening brief. We consider it only as persuasive authority. Brown v. Old Navy, LLC, No. 102592-1, slip op. at 5 (Wash. Apr. 17, 2025), https://www.courts.wa.gov/opinions/pdf/1025921.pdf.

the clock-in and -out records, witness testimony established that Providence did not have a system that ensured employees who worked at least 10 hours took a second meal break but rather required employees to actively assert their desire or need for a second meal break.

Human resources officer Fisher confirmed that meal breaks at Providence are supposed to be uninterrupted and duty free. However, if an employee with a shift of more than 10 hours wants a second meal break "outside of what has now been a decades long norm, they would need to work with their leader to say I want that second meal and I'm going to clock in and out and here's how to schedule it." Providence also has a long-standing default practice that employees who have 12-hour shifts remain at work for a total of 12-and-a-half hours to account for one meal break. If the employee wants the benefit of a second meal break, then Providence expects the employee to work an extra 30 minutes after their scheduled shift end time for a total shift time of 13 hours. Fisher was asked:

> Q. But in general you're not aware of any widespread practice of employees taking second meals and failing to account for them within Kronos, correct?
> A. No, and my assumption and belief is that in general health care workers who could be entitled and want to take a second meal break, typically don't because they want to end work after 12-and-a-half hours and not end work after 13 hours.

Additionally, Fisher testified that it is Providence's policy that employees who do not take a meal period must document their waiver in writing.

Hansen testified that during her time supervising caregivers as a clinical manager for diagnostic imaging at Providence's St. Peter Hospital between October 2017 and March 2022, she discussed with the Providence human resources department the

25

possibility of having two 30-minute meal periods built into caregivers' 12-hour shifts, but human resources made the decision to require hourly employees who wanted a second meal period to extend their shift to 13 hours to account for the second meal break.

According to Hansen, none of the caregivers she supervised

wanted to work 13-hour shifts, and they would have preferred to have said, "Okay. I'll take my lunch … when I can get it in the second half of my shift instead of having a blocked lunch period and then I wouldn't have to work an extra 30 minutes like at the beginning or end of my shift."

Because caregivers on her team were unwilling to extend their shift to 13 hours to include a second meal period, "caregivers were permitted to take their second meal period as an on-duty meal period, which meant their break was not scheduled but they were paid for their time." This meant that "[t]hese caregivers would fit a meal period into their downtime between patient visits."

None of the caregivers that unit manager Boshart supervised ever approached her to request a second meal period. For shifts of 10-and-a-half hours, Klug testified that most employees took one lunch break and no one took a second meal period. Klug said if employees who worked 12-and-half-hour shifts wanted a second meal break, "they could clock in or out and back in," but "[n]o one took a second break. I never had my employees do it. It doesn't mean they couldn't do it."

Though Providence may not have barred its employees from taking second meal breaks, the above evidence establishes that Providence placed the burden on caregivers to request a second meal break and to account for it by extending the normal length of their shift to more than the minimum hours that would trigger a mandatory second meal period under the law. See WAC 296-126-092(1)-(2); see also Brady, 188 Wn.2d at 580-81 (discussing meal period provisions of WAC 296-126-092). The record

26

shows that these policies and practices effectively discouraged eligible employees from taking a second meal break by making it an impractical option. Additionally, multiple witnesses, including class members, testified that either they were not aware that certain hourly employees were entitled to a second meal period, or they did not know when employees generally would be entitled to a second meal period.

Further, while the Kronos time reporting system required Providence's hourly employees to attest to whether they were provided meal periods at the time they clocked out from their shifts, Kronos did not provide employees with an option to report whether they missed two meal periods. Fisher testified that Providence tried to ensure that the attestation questions on Kronos accurately reflected Providence's policies and expectations. The attestations in the Kronos system gave three options: (1) "I did not work more than 5 hours," (2) "Yes, I was provided my meal period(s) and I worked more than 5 hours," and (3) "No, I was not provided my meal period(s) and I worked more than 5 hours." The attestations thus did not contemplate a second meal break that an employee could take for a shift that was more than 10 hours. To this end, Providence's payroll executive director Bishop was asked:

> Q. … So if somebody is subject to the meal period auto deduction, there is no way [for an employee] to alert Providence through the attestation process that they received their first meal period after five hours, but did not receive their second meal period they may have been eligible for.
> …
> A. Their time would have been clocked in and out, so it shows they were working.

Providence also has not configured Kronos to automatically compensate Washington employees if they miss a meal period. Larson, who testified she had been responsible for Kronos application at Providence since 2013, said there is no process or

27

practice by which an employee can get paid for an additional 30 minutes for missing a meal period. Larson was asked how Providence set up Kronos for Washington employees as opposed to California employees in respect to accounting for meal periods:

> Q      The meal period confirmation [in Kronos] does not give employees the option of reporting one or two missed meal periods, does it?
> A      Correct.
> …
> Q      … So is there any reason from a technical standpoint that Kronos couldn't be configured to allow someone to report missing two meal periods, missed meal periods, which would add –
> A      Technically, no.
> Q      Providence made an intentional choice to program Kronos …?
> A      There is one meal deduction, automated meal deduction to cancel.
> Q      When employees in California miss a meal period, how does that affect their pay?
> A      They are – the system applies a one-hour pay code called meal penalty.
> Q      And Providence has made the intentional choice to configure Kronos for California employees to do that, correct?
> A      Correct.
> Q      So if an employee in California has a regular lunch period of 30 minutes, and they miss that lunch, and they attest to that in Kronos, they are paid for an additional hour of compensation, correct?
> A      Not through attestation.
> Q      What do I have wrong about that?
> A      For California, nonexempt caregivers have to clock in and out for meal periods. The meal penalty is automatically calculated. So if they do not clock in and out for their meal period, they miss it, there is no calculation that the attestation question does.
> Q      It's just a payroll programmed into Kronos to automatically generate that additional hour's worth of compensation, correct?
> A      Correct. It is a configuration item.
> Q      A configuration item. That sounds like a term of art. Is there any reason that the configuration item technically couldn't be applied to Washington caregivers?
> A      Technically, no.
> Q      Providence has simply made the choice not to apply the configuration item that you just described to Washington caregivers?
> A      Washington is set up differently than California, yes.
> Q      Because Providence chose to?
> A      Yes.

28

Providence claims that the trial court erred by not considering evidence that purportedly indicates some caregivers may have received paid meal breaks. We are unmoved by this claim for two reasons.

First, Providence broadly cites to hundreds of pages in the record for support, claiming that it presented evidence that caregivers received paid meal breaks,

> including evidence of paid-meal-break agreements, a clinic manager's testimony that her caregivers were instructed to take paid meal breaks (and that other clinics took the same approach), testimony regarding time-record entries indicating meal-period exceptions (i.e., paid meal periods or waivers), and expert testimony that caregivers had gaps in their work hours that allowed paid breaks (i.e., circumstantial evidence that breaks occurred).

RAP 10.3(a)(6) requires parties to provide "argument in support of the issues presented for review, together with citations to legal authority and references to relevant parts of the record." See Cowiche Canyon Conservancy v. Bosley, 118 Wn.2d 801, 809, 828 P.2d 549 (1992). The purpose of the rule "is to enable the court and opposing counsel efficiently and expeditiously to review the accuracy of the factual statements made in the briefs and efficiently and expeditiously to review the relevant legal authority." Hurlbert v. Gordon, 64 Wn. App. 386, 400, 824 P.2d 1238 (1992). Because Providence fails to point to specific parts of the record to support its argument and otherwise provides generalized descriptions of evidence, we decline to consider it. See Heilman v. Wentworth, 18 Wn. App. 751, 754, 571 P.2d 963 (1977) (stating that this court is not required to search the record for evidence supporting a party's claim of error).

Second, ostensible evidence of specific instances of compliance with WAC 296-126-092 is not sufficient to counter plaintiffs' evidence that caregivers generally did not take second meal breaks or evidence regarding Providence's general policy and

practice toward second meal breaks. To the extent that Providence proffers evidence indicating that certain caregivers <u>may</u> have received the required respite from work in the form of paid second meal breaks or that certain caregivers <u>may</u> have waived second meal breaks is insufficient to defeat summary judgment as to the question of liability. <u>Strauss</u>, 194 Wn.2d at 301 ("'[S]peculation and conclusory statements will not preclude summary judgment.'") (quoting <u>Volk v. DeMeerleer</u>, 187 Wn.2d 241, 277, 386 P.3d 254 (2016)).

On balance, absent specific facts that rebut plaintiffs' evidence showing that Providence had a default system that assumed caregivers would not take second meal breaks—and intentionally set up its timekeeping system to not automatically compensate caregivers for missed meal breaks—no reasonable jury could find a genuine dispute regarding Providence's failure to safeguard caregivers' rights to mandated respite in the form of meal breaks. <u>See</u> <u>Androckitis</u>, 32 Wn. App. 2d at 432-33; 441-43 (discussing employees' right to a meaningful meal period and employer's linked affirmative responsibility to protect employees from unhealthy labor conditions as regulated by the IWA); <u>Brady</u>, 188 Wn.2d at 584 ("WAC 296-126-092 imposes a mandatory obligation on the employer to provide meal breaks and to ensure those breaks comply with the requirements of WAC 296-126-092."). We conclude that plaintiffs established that Providence did not provide timely meal breaks to the caregiver class in violation of the IWA.

*(i) Waiver*

Providence contends that the trial court erred in determining that Providence failed to establish the affirmative defense of waiver to the second meal period claim.

Providence claims it presented sufficient evidence of waiver to defeat summary judgment. We disagree.

To establish a valid waiver to a timely meal break, a defendant must show "'the intentional and voluntary relinquishment of a known right.'" Androckitis, 32 Wn. App. 2d at 450 (quoting Pellino, 164 Wn. App. at 696-97). Waiver "'may result from an express agreement or be inferred from circumstances indicating an intent to waive.'" Id. (quoting Pellino, 164 Wn. App. at 697). A showing of implied waiver requires evidence of unequivocal acts or conduct showing an intent to waive and will not be inferred from doubtful or ambiguous factors. Id. Evidence that class members had the option to waive their meal break and that such waiver was commonplace is not sufficient. See id. at 451-52.

Providence argues that the trial court erred in determining that evidence of 387 second-meal-period waivers was not indicative as to whether Providence was liable under the IWA. Providence asserts that the trial court should have allowed the jury to consider the persuasive value of such representative evidence as it pertained to the issue of class-wide liability. We disagree.

We first observe, as noted above, the record does not support Providence's assertion that it submitted evidence of 387 class members' individual written waivers to the trial court at summary judgment. The standard to defeat summary judgment "requires the production of evidence; mere speculation will not suffice to defeat summary judgment." Cornwell v. Microsoft Corp., 192 Wn.2d 403, 420, 430 P.3d 229 (2018).

More importantly, however, Providence conflates the issue of whether individual

caregivers waived their right to a second meal break with whether Providence had a system in place that ensured caregivers received timely second meal breaks in compliance with the IWA. The issue of individualized waivers in this case can be traced back to the trial court's initial certification of the second meal period class. In its certification order, the trial court noted that Providence at that time had produced 27 waivers from individual caregivers. In respect to the superiority requirement under CR 23,[23] the trial court stated:

> Providence raises meal waivers as individualized issues, for example, but Providence has only produced 27 waivers from the putative class of 25,000 caregivers, undercutting Providence's argument that "many" caregivers in fact waived meal periods and that the waiver issue would predominate over the common ones. Additionally, considerable testimony from Providence's management employees supports a conclusion that its policies were widely trained upon and fairly known and understood by its employees contrasted. To the extent that "different supervisors, departments and locations [or ministries]" "handled" second meal periods differently, the record reflects this was part of the uniform policy. Providence's policy invested supervisors with some authority over second meal period requests. Thus, the issue about the efficacy and reasonableness of the policy includes scrutiny of this practice, which was built into the hospital-wide policy and is subject to resolution on a class-wide basis.
> Therefore, the Court CONCLUDES that Plaintiffs have met the superiority requirement of CR 23(b)(3).

(Emphasis added) (alteration in original).

In Chavez v. Our Lady of Lourdes Hospital at Pasco, our Supreme Court overturned the trial court's denial of class certification on claims against Lourdes Hospital for unpaid wages as a result of the hospital's failure to ensure meal and rest

---

[23] In addition to the four prerequisites to class certification stated in CR 23(a), a class action must satisfy one of the requirements under CR 23(b), which includes the court's finding "that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." CR 23(b)(3).

breaks in violation of WAC 296-126-092. 190 Wn.2d 507, 512-13, 524-25, 415 P.3d 224 (2018). The court considered whether the trial court abused its discretion in determining that the nurse-plaintiffs failed to satisfy the predominance and superiority requirements of CR 23(b)(3). Id. at 513.

The Supreme Court cited its decision in Lopez Demetrio v. Sakuma Brothers Farms, Inc., wherein it stated that

> [i]t is not enough for an employer to simply schedule time throughout the day during which an employee can take a break if he or she chooses. Instead, employers must affirmatively promote meaningful break time. A workplace culture that encourages employees to skip breaks violates WAC 296-126-092 because it deprives employees of the benefit of a rest break "on the employer's time."

Id. at 518 (quoting Lopez Demetrio, 183 Wn.2d 649, 658, 355 P.3d 258 (2015)); see Pellino, 164 Wn. App. at 688 (observing that the plain language of WAC 296-126-092 requires employers to provide required meal breaks, as well as rest breaks, to employees "'on the employer's time'") (quoting WAC 296-126-092(2), -092(4)).

The Chavez court emphasized that the trial court's concern regarding individualized differences in nurse type and shift length was not objectively "relevant to a determination of whether the hospital maintained an adequate system for ensuring that nurses could take breaks and record missed breaks." 190 Wn.2d at 518-19; see id. at 511 n.1 (collectively referring to rest breaks and second meal periods "as breaks or missed breaks"). Though such individualized factors "are relevant to a damages calculation because they help the court determine how many breaks a nurse was entitled to," such factors do not pertain to a determination of "the hospital's liability regarding its obligation to comply with WAC 296-126-092." Id. at 519.

Thus, as in Chavez, a class action regarding an employer's common policy and

practices "is not defeated merely because individual factual or legal issues exist." Id. "'A single common issue may be the overriding one in the litigation, despite the fact that the suit also entails numerous remaining individual questions.'" Id. (internal quotation marks omitted) (quoting Miller v. Farmer Bros. Co., 115 Wn. App. 815, 825, 64 P.3d 49 (2003)). "That class members may eventually have to make an individual showing of damages does not preclude class certification." Smith v. Behr Process Corp., 113 Wn. App. 306, 323, 54 P.3d 665 (2002). Indeed, "'forcing numerous plaintiffs to litigate the alleged pattern or practice ... in repeated individual trials runs counter to the very purpose of a class action.'" Chavez, 190 Wn.2d at 523 (quoting Sitton v. State Farm Mut. Auto. Ins. Co., 116 Wn. App. 245, 256-57, 63 P.3d 198 (2003)).

On appeal Providence seeks to revive the issue of individualized waivers as to summary judgment. But it does not challenge the trial court's initial class certification, which included the court's determination that individualized waiver issues were not pertinent to the common question of Providence's liability to the second meal period class based on its overall policy and practices toward second meal breaks. This same rationale supports the court's decision to reserve for trial on damages the question of whether individual caregivers waived their entitlement to second meal breaks. Thus, on this record, we conclude that evidence of individual waivers is not sufficient to defeat summary judgment.[24]

---

[24] This likewise disposes of Providence's argument that the trial court erred by not considering evidence of variance codes in Providence's human resources information system, called Lawson, that "could represent that the caregiver had an on-duty meal period, agreed to a 'no lunch' (or 'NL'), or agreed to waive one or more meal periods." The purpose of the "NL" code was to prevent Kronos from automatically deducting 30 minutes from the first meal period. According to Providence's Principal Human Resources Consultant Kylene Taylor, Lawson does not reflect whether employees waived a second meal period.

Next, Providence takes issue with the fact that the trial court granted summary judgment to the second meal period class but reserved the issue of whether Providence violated Hughes' right to a second meal period for trial. In its summary judgment order, the court stated that "the evidence submitted presents a question of fact whether Hughes was denied a second meal period, whether Hughes waived a second meal period, and whether Hughes received on-duty second meal periods. Thus, Hughes' individual claim regarding second meal breaks requires a trial."

Providence seems to argue that because the trial court previously determined that Hughes' claim was representative of the class, the court's denial of summary judgment for former co-class representative Hughes' individual second meal period claim compels a genuine dispute as to whether Providence violated the class' right to timely meal periods under the IWA. Providence's argument is not well taken.

At the time the court considered the parties' cross-motions for summary judgment, the court had already granted certification to the class based on the common issues of whether Providence met its legal obligation to ensure employees received second meal breaks. Though the court stated in its certification order that "[q]uestions of fact and law will apply equally to Plaintiffs [Bennett and Hughes] as well as the entire certified class," it was not until summary judgment that Providence provided evidence of Hughes' written waiver of second meal periods.

---

Additionally, based on the foregoing analysis, we need not consider Providence's assertion that the trial court incorrectly extrapolated the representative value of 387 caregivers' purported written meal-break waivers. ("Thus, Providence could potentially evidence waivers from 0.014 percent of the … second meal period class. … This is not sufficient to prevent a finding of class wide liability."). See Martinez-Cuevas v. DeRuyter Brothers Dairy, 196 Wn.2d 506, 514, 475 P.3d 164 (2020) ("An order granting summary judgment may be affirmed on any legal basis supported by the record.").

35

Providence does not appeal the trial court's certification of the second meal period class or the court's findings therein. Nor does Providence assign error to the trial court's later granting of plaintiff's motion to dismiss Hughes' individual second meal period claim. Rather, on the meal break claim, Providence challenges the court's order granting summary judgment to plaintiffs on the issue of Providence's liability under the IWA. As discussed above, evidence that certain individual employees waived their right to second meal periods is not sufficient to refute evidence of Providence's general policies and practices toward mandated second meal breaks to establish liability to the class.

We acknowledge it is not clear from the trial court's order why it reserved Hughes' individual second meal period claim for separate litigation regarding liability rather than addressing it as part of the damages phase with the other "ostensible" individual written waivers. However, this decision is immaterial to the court's conclusion that there was no genuine dispute as to Providence's policy and culture-based failure to ensure that remaining class representative Bennett and class members received second meal breaks as they were entitled to them. Notably, Providence agreed below that Hughes' individual second meal period claim should be dismissed because she was "an inadequate and atypical representative of the second meal period class," and fails to acknowledge on appeal that Bennett remained as class representative.

Providence also argues the trial court erred by not considering evidence that Providence simply complied with collective bargaining agreements (CBAs) through which thousands of class members purportedly waived their rights to second meal periods.

In opposition to plaintiffs' motion for summary judgment, Providence proffered three CBAs as representative of "language contained in 30 total [CBAs] applicable to approximately 12,333 class members." One CBA discussed work shifts with no mention of second meal breaks other than stating 16-hour shifts included paid meal periods. The two other CBAs acknowledged that the nurse-employee and their medical center or hospital site employer could mutually agree to only one 30-minute unpaid meal period per 12-hour shift.

Providence submitted an additional CBA between Providence Sacred Heart Medical Center and union employees in support of its motion for summary judgment, which both stated, "Employees shall be allowed … a thirty (30) minute unpaid meal period" and meal periods "shall be administered as provided by state law (WAC 296-126-092)." Immediately following this sentence, the agreement stated, "This Agreement constitutes a waiver of a second meal period for any shift of any length." As stated above, WAC 296-126-092 provides that "[e]mployees shall be allowed a meal period of at least thirty minutes which commences no less than two hours nor more than five hours from the beginning of the shift" and that "[n]o employee shall be required to work more than five consecutive hours without a meal period." WAC 296-126-092(1)-(2) (emphasis added); see also Admin. Pol'y ES.C.6.1, § 5 ("For example, an employee who normally works a 12-hour shift shall be allowed to take a 30-minute meal period no later than at the end of each five hours worked. … The second 30-minute meal period must be given within five hours from the end of the first meal period and for each five hours worked thereafter."). Also, "Employees working three or more hours longer than a normal work day shall be allowed at least one thirty-minute meal period prior to or

during the overtime period." WAC 296-126-092(3) (emphasis added); see also Admin. Pol'y ES.C.6.1, § 5 (defining "normal work day" as "the shift the employee is regularly scheduled to work"). The text of WAC 296-126-092 is not included in the language of the Sacred Heart CBA. Providence seems to suggest that because the parties to the agreement agreed to waiver of a second meal period of any shift of any length, this agreement both satisfies Providence's obligation under the law to allow second meal periods and also that individual caregivers, who are represented by this particular CBA, waived such meal periods. We are not persuaded.

We have previously held that because a waiver in a CBA is not evidence of an individual employee's choice, employees cannot collectively waive their individual rights to meal periods under WAC 296-126-092. Hill v. Garda CL Nw., Inc., 198 Wn. App. 326, 345, 354, 394 P.3d 390 (2017), rev'd on other grounds by 191 Wn.2d 553, 424 P.3d 207 (2018). "An individual worker may 'vote against representation; but the majority rules.'" Id. at 354 (quoting J.I. Case Co. v. Nat'l Lab. Relations Bd., 321 U.S. 332, 339, 64 S. Ct. 576, 88 L. Ed. 762 (1944)). "[A]n agreement with a plaintiff's union 'cannot be viewed as an agreement with [the plaintiff] individually.'" Id. (second alteration in original) (quoting Ervin v. Columbia Distrib., Inc., 84 Wn. App. 882, 893, 930 P.2d 947 (1997)). Therefore, Providence's reliance on CBAs is unavailing. See also Admin. Pol'y ES.C.6.1, at § 15 (stating that CBA provisions "covering specific requirements for meal and rest periods must be [at] least equal to or more favorable than" requirements under the IWA and WAC 296-126-092, "with the exception of public employees and construction employees covered by a CBA").

Lastly, Providence argues that the trial court erred by not considering evidence of

implied waiver on the basis that it found that Providence waived the defense. In its summary judgment order, the trial court stated:

> Providence waived any implied waiver affirmative defense. See Plaintiff's Motion for Partial Summary Judgment 17-19. Even if Providence had not waived this defense, Providence fails to present sufficient evidence of waiver based on constructive knowledge of the right to a second meal period, and this argument is rejected.

We agree with Providence to the extent that the trial court abused its discretion in its determination that Providence waived the affirmative defense of implied waiver. See Gunn v. Riely, 185 Wn. App. 517, 528, 344 P.3d 1225 (2015) (stating that a trial court's decision to strike an affirmative defense based on waiver is reviewed for abuse of discretion). An abuse of discretion occurs when a trial court's decision is manifestly unreasonable, exercised on untenable grounds, or exercised for untenable reasons. Mayer v. Sto Indus., Inc., 156 Wn.2d 677, 684, 132 P.3d 115 (2006).

In its summary judgment order, the trial court cited to plaintiffs' argument that Providence neither raised the defense of "implied meal period waiver" in its answer to Bennett's original complaint nor clarified that it intended to raise implied waiver as a defense in its answers to Bennett's first interrogatories.[25] Yet the court cited no authority, and the plaintiffs provide none, that requires a defendant to be so explicit in its raising of the affirmative defense of waiver that it specifies between the defense of express or implied waiver. See Androckitis, 32 Wn. App. 2d at 450 (stating that valid waiver defense to alleged meal break violation may result from express agreement or implied waiver).

In its answers to the original and amended complaints, Providence raised the

---

[25] Filed prior to the amended class action complaint adding Hughes as a co-class representative.

defense of "waiver." In its answer to Bennett's first interrogatories, Providence objected and stated that "[d]iscovery is ongoing and [Providence] reserves the right to supplement this response as additional information becomes available in discovery." Later, when Providence withdrew good faith defenses in response to plaintiffs' motion to compel discovery, it specified that it continued to assert the defense of waiver. The record thus does not indicate that Providence's assertion of implied waiver is inconsistent with its previous behavior to constitute a waiver of the defense. See Lybbert v. Grant County, 141 Wn.2d 29, 38-39, 1 P.3d 1124 (2000). A defendant's "engag[ement] in discovery following the assertion of an affirmative defense does not indicate waiver." King v. Snohomish County, 146 Wn.2d 420, 425, 47 P.3d 563 (2002).

However, the trial court also stated in its summary judgment order that even if Providence did not waive the defense of implied waiver, "Providence fails to present sufficient evidence of waiver based on constructive knowledge of the right to a second meal period, and this argument is rejected." On appeal, other than the purported evidence of waiver discussed above, Providence does not provide argument with citations to the record as to what specific evidence of implied waiver is sufficient to defeat summary judgment. RAP 10.3(a)(6). Thus, on this record, we cannot say that the trial court erred by not considering Providence's assertion that caregivers constructively waived their right to second meal breaks.

For the foregoing reasons, we conclude that Providence has not met its burden to provide evidence from which a reasonable jury could find a genuine dispute as to Providence's liability to the second meal period class.

40

Double Damages

Providence contends that the trial court erred by ruling on summary judgment that Providence willfully underpaid caregivers to warrant an award of double damages as a matter of law on the rounding and second meal break claims. Providence avers that the plaintiffs failed to establish that Providence willfully committed wage violations against the rounding or second meal period classes. We disagree.

Under RCW 49.52.050 and .070 of the Wage Rebate Act, an employer is liable for double damages for willful wage violations unless it carries the burden of showing that a statutory defense applies. RCW 49.52.050(2); Hill, 191 Wn.2d at 561-62. This includes wage violations based on an employer's noncompliance with meal period requirements under the IWA. Androckitis, 32 Wn. App. 2d at 458 & n.16 (citing Hill, 198 Wn. App. at 360 (citing Wingert v. Yellow Freight Sys., Inc., 104 Wn. App. 583, 586, 588-90, 13 P.3d 677 (2000)). These statutes provide that an employer who "[p]ays any employee a lower wage than the wage such employer is obligated to pay such employee" "shall be liable … to judgment for twice the amount of the wages unlawfully … withheld by way of exemplary damages, together with costs of suit and a reasonable sum for attorney's fees" if the employer withheld the wages willfully and with the intent to deprive the employee of any part of the employee's wages, and the employee did not knowingly submit to such violations. RCW 49.52.050(2), .070.

The Washington Supreme Court has held that "[w]here an employer fails to pay wages owed, only two instances negate a finding of willfulness: (1) 'the employer was careless or erred in failing to pay' or (2) 'a bona fide dispute existed between the employer and employee regarding the payment of wages.'" Wash. State Nurses Ass'n

v. Sacred Heart Med. Ctr., 175 Wn.2d 822, 834, 287 P.3d 516 (2012) (internal quotation marks omitted) (quoting Morgan v. Kingen, 166 Wn.2d 526, 534, 210 P.3d 995 (2009)); see also Hill, 191 Wn.2d at 561-62 (discussing the willfulness standard under RCW 49.52.050(2)).

The employer carries the burden to show that a bona fide dispute existed about whether the wages at issue "were really due" to the employee. Hill, 191 Wn.2d at 561-62; Wash. State Nurses Ass'n, 175 Wn.2d at 834. To establish a bona fide dispute, the employer must show that (1) the employer had a subjective "genuine belief in the dispute at the time of the wage violation" and (2) "[the] dispute must be objectively reasonable—that is, the issue must be fairly debatable." Hill, 191 Wn.2d at 562 (citations omitted) (internal quotation marks omitted). "At summary judgment, the objective component is a question of law, while the subjective [genuine belief] component is an issue of fact." Androckitis, 32 Wn. App. 2d at 457. Even though the subjective component is a factual issue, a trial court may resolve the issue on summary judgment where no reasonable dispute exists as to the material facts. Id. at 457 n.14 (citing Backman v. Nw. Pub. Ctr., 147 Wn. App. 791, 796, 197 P.3d 1187 (2008)); Wash. State Nurses Ass'n, 175 Wn.2d at 834.

Here, Providence does not argue that the underpayment of caregivers' wages under its rounding policy was the result of mistake or a bona fide dispute at the time of the wage violation. On the second meal period claim, it is undisputed that Providence did not have a mechanism for caregivers to receive compensation for a deprivation of their right to the respite of meal periods. See Androckitis, 32 Wn. App. 2d at 458-59. Regardless, relying on evidence of CBAs, paid-meal-break agreements, and waivers,

Providence asserts that the trial court erred in determining that Providence could not show a bona fide dispute as to whether it was obligated to pay caregivers for missed second meal breaks. Relatedly, Providence avers that caregivers knowingly submitted "to rounding and meal-period arrangements." However, because the record plainly shows that Providence waived any affirmative defense related to good faith, its contention cannot stand.

As stated above, Providence withdrew affirmative defenses of good faith prior to summary judgment. Providence's assertion that it "agreed to give up certain defenses in relation to Plaintiffs' unpaid-wage claims but did not give up defenses in relation to meal-period claims" is not supported by the record. In its opposition to plaintiff's motion to compel discovery, Providence stated:

> Plaintiffs primarily seek to compel privileged communications containing legal advice provided by Providence's <u>counsel about meal break and timeclock rounding policies</u>. As a threshold matter, Providence believes its Affirmative Defenses Nos. 8 ("good faith reasonable belief"), 9 ("good faith dispute"), and 17 ("good faith in conformity with and in reliance on an administrative regulation, order, ruling, approval, interpretation, administrative practice, and/or enforcement policy of the Wage and Hour Division of the United States Department of Labor") <u>are not necessary to its defense and therefore withdraws them.</u> With these affirmative defenses withdrawn, <u>the privileged documents Plaintiffs seek to compel are not at issue in this case</u> and there can be no implicit waiver of the attorney-client or work product privilege.
> …
> Based on discovery that has been completed and Providence's internal investigation of Plaintiffs' class <u>claims</u>, Providence believes its "good faith belief" affirmative defenses (Affirmative Defenses Nos. 8, 9, and 17) are not necessary to its defense and therefore withdraws them.

(Emphasis added.) Providence reiterated that because it withdrew its good faith affirmative defenses, "Providence's basis for its subjective, good faith belief that it complied with the law is not 'vital information' in this case."

As a result of its voluntary withdrawal of good-faith defenses, no reasonable jury could find that Providence had a subjective genuine belief that it did not owe caregivers wages at the time of its wage violations as required for a showing of a bona fide dispute to negate willfulness. Thus, on this record, the trial court did not err by determining at summary judgment that Providence willfully deprived caregivers of wages as a matter of law.

It is for this same reason that Providence's argument that caregivers knowingly submitted to wage deprivations fails.

We reject Providence's assertion that plaintiffs have the burden to show that they did not knowingly submit to wage deprivations under RCW 49.52.070 to establish that Providence willfully deprived them of wages. Providence relies on our unpublished opinion in Ruhl v. ProjectCorps, LLC, No. 72604-8-I, slip op. at 12 n.58 (Wash. Ct. App. Feb. 16, 2016) (unpublished), https://www.courts.wa.gov/opinions/pdf/726048.pdf. See GR 14.1(a). We are bound by the decisions of the Washington Supreme Court,[26] which has recognized an employee's knowing submission to an employer's withholding wages as an affirmative statutory defense to a willful withholding claim. Hill, 191 Wn.2d at 559, 572; see Schilling v. Radio Holdings, Inc., 136 Wn.2d 152, 165 n.6, 961 P.2d 371 (1998) ("RCW 49.52.070 provides a specific exception to the double damages requirement of the statute for an 'employee who has knowingly submitted to such violations.' This exception evidences the Legislature's understanding of its ability to carve out exceptions to the double damages provision of the statute.") (quoting former

---

[26] Peterson v. Dep't of Lab. & Indus., 17 Wn. App. 2d 208, 237, 485 P.3d 338 (2021).

RCW 49.52.070 (1939)).[27]

To establish the statutory defense of knowing submission to a withholding of wages under RCW 49.52.070,[28] an employer must show that the employee intentionally deferred to the employer the decision as to whether the employee would be paid. Durand v. HIMC Corp., 151 Wn. App. 818, 836-37, 214 P.3d 189 (2009). "An employee does not 'knowingly submit' to unlawful withholding of wages by staying on the job even after the employer fails to pay." Id. at 837 (quoting Chelius v. Questar Microsystems, Inc., 107 Wn. App. 678, 682, 27 P.3d 681 (2001)). Providence's withdrawal of good-faith defenses effectively blocked discovery related to its belief that its rounding and meal period practices were lawful. This limiting of the record necessarily precludes Providence's ability to successfully assert the defense that it made the decision to not pay caregivers based on prior "individual and collective agreements" with caregivers.

Moreover, we reject Providence's claim that caregivers knowingly submitted to Providence's nonpayment of wages. Knowing submission under RCW 49.52.070 is specific to the employer's withholding of wages. Id. at 836-37. Providence does not provide argument or cite to the record to establish that caregivers agreed to the underpayment of wages that they were otherwise entitled to under the MWA or for

---

[27] The applicable language of RCW 49.52.070 has not changed since Schilling. Compare LAWS OF 2010, ch. 8, § 12056 with LAWS OF 1939, ch. 195, § 3.
[28] RCW 49.52.070 provides in full:

Any employer and any officer, vice principal or agent of any employer who shall violate any of the provisions of RCW 49.52.050 (1) and (2) shall be liable in a civil action by the aggrieved employee or his or her assignee to judgment for twice the amount of the wages unlawfully rebated or withheld by way of exemplary damages, together with costs of suit and a reasonable sum for attorney's fees: PROVIDED, HOWEVER, That the benefits of this section shall not be available to any employee who has knowingly submitted to such violations.

missed meal breaks as mandated by the IWA.[29] See Chelius, 107 Wn. App. at 681-83.

We affirm the court's award of double damages to Providence under RCW 49.52.050 and .070.

Jury Instruction

Providence contends that the trial court erred by instructing the jury to award overtime wages to the second meal period class for missed meal breaks, and claims that caregivers should have been compensated for missed breaks based on their contracted wage rate. Finding no error with the court's instruction, we deny Providence's challenge.

This court reviews a challenge to a jury instruction de novo if it is based upon a matter of law. Kappelman v. Lutz, 167 Wn.2d 1, 6, 217 P.3d 286 (2009). If the trial court's jury instruction correctly states the law, we review the court's decision to give the instruction for abuse of discretion. State v. Stacy, 181 Wn. App. 553, 569, 326 P.3d 136 (2014). Jury instructions are sufficient if they allow each party to argue its case, are not misleading, and properly inform the jury of the applicable law when read as a whole. Bodin v. City of Stanwood, 130 Wn.2d 726, 732, 927 P.2d 240 (1996). An erroneous jury instruction is reversible error only if the error was prejudicial, which the moving party has the burden to prove. Anfinson v. FedEx Ground Package Sys., Inc., 174 Wn.2d 851, 860, 281 P.3d 289 (2012); Fergen v. Sestero, 182 Wn.2d 794, 803, 346 P.3d 708 (2015). Prejudice is presumed where the trial court's jury instruction misstates the law. Keller v. City of Spokane, 146 Wn.2d 237, 249-50, 44 P.3d 845 (2002).

---

[29] And because, as discussed above, employees cannot collectively negotiate away their basic entitlement to meal breaks, Providence's argument that the trial court erred by disregarding evidence of class members' knowing submission to underpayment for missed meal breaks by way of CBAs is without merit. See Hill, 198 Wn. App. at 354.

Wage-based compensation is an appropriate remedy for a meal period violation. Androckitis, 32 Wn. App. 2d at 444. Washington courts "have repeatedly recognized that measuring a remedy as the value of wages for the period of time spent working— rather than resting—during a meal or rest period is appropriate." Id. Our Supreme Court has recognized that where an employee's total workday is extended when they are required to work through a required rest period, payment of overtime wages is a proper remedy for a violation of chapter 49.12 RCW. Wash. State Nurses Ass'n, 175 Wn.2d at 830.

Based on Instruction Number 12, the trial court told the jury:

> For purposes of the claim for missed second meal periods, the Court has ruled that Providence did not provide class members who worked at least ten hours in a single shift a second 30-minute meal period. Providence's failure to provide a second meal period is a wage violation that requires a remedy in the form of wage compensation for missed 30-minute meal periods.
> The Court has found Providence liable for damages to Ms. Bennett and the second meal class resulting from missed 30-minute meal periods.
> Regarding the second meal period claim, the Court has ruled that Providence is liable because it did not provide employees a second unpaid meal period when they worked more than 10 hours in a shift as required by Washington law. Employees who were not provided a required meal period are entitled to wages equivalent to 30 minutes of additional compensation at their regular wage rate. When a meal period violation occurs during a time period in which the employee qualified for overtime pay, the 30 minutes of additional compensation must be paid at the employee's overtime rate.

(Emphasis added.)

In delivering the jury instruction, the trial court did not direct the jury to award damages to the caregiver class according to their overtime rates. Rather, the court left the determination to the jury as to whether missed meal periods occurred when the caregivers would otherwise be earning overtime pay. The court's instruction that an

47

employee may be awarded the amount of wage compensation that they would be earning for the time they were working instead of resting is aligned with instructive case law. See Wash. State Nurses Ass'n, 175 Wn.2d at 830; Androckitis, 32 Wn. App. 2d at 444. The trial court did not abuse its discretion in providing Instruction 12.

### Attorney Fees on Appeal

Plaintiffs request an award of attorney fees and costs on appeal. This court may award attorney fees on appeal if supported by applicable law. RAP 18.1. Plaintiffs cite RCW 49.46.090, RCW 49.48.030, and RCW 49.52.070, each of which authorizes an award of attorney fees and costs in legal actions related to enforcing the rights of employees. We conclude that the plaintiffs prevail in this matter[30] and grant their request. Upon proper application, a commissioner of this court will enter an appropriate order.

Affirmed.

Coburn, J.

WE CONCUR:

_____, ACJ     Mann, J.

---

[30] Because Providence did not argue at summary judgment that plaintiffs' claims were preempted by section 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a), we do not consider this argument on appeal. RAP 2.5(a).

Additionally, because Providence fails to present substantive argument and cites to the record, we do not consider its due process claim. RAP 10.3(a)(6). Providence makes general complaints against the trial court's certification of the allegedly "vast" caregiver class and denials of evidence yet states in its briefing that it is not challenging class certification or any of the court's evidentiary rulings. See State v. Johnson, 179 Wn.2d 534, 558, 315 P.3d 1090 (2014) ("Where a petitioner makes a due process challenge, '[n]aked castings into the constitutional seas are not sufficient to command judicial consideration and discussion.'") (internal quotation marks omitted) (quoting State v. Blilie, 132 Wn.2d 484, 493 n.2, 939 P.2d 691 (1997)).